AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN** _____ **DISTRICT OF** ~~CALIFORNIA~~ FILED

UNITED STATES OF AMERICA

v.

DOSIE DEE KING,
FRED LEON WIGGINS

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

**CRIMINAL COMPLAINT**

WDB

CASE NUMBER 4 • 0 6 - 7 0 6 8

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____ August 16, 2006 _____ in _____ Contra Costa _____ county, in the _____ Northern _____ District of _____ California _____ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally conspire to distribute, and distributed, a Schedule II controlled substance, namely, approximately 13.6 grams of a mixture or substance containing a detectable amount of cocaine base

in violation of Title _____ 21 _____ United States Code, Section(s) _____ 846, 841(a)(1) _____

I further state that I am a(n) _____ FBI Special Agent _____ and that this complaint is based on the following
_____Official Title_____

facts:

See Attached Affidavit of Doug Hunt

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved
As To
Form: *Garth Hire [as]*

AUSA: GARTH HIRE

*[signature]*

Name/Signature of Complainant:

Sworn to before me and subscribed in my presence,

_____ Oct 24, 2006 _____ at _____ SAN FRANCISCO, CALIFORNIA _____

Date                                                                City and State

HONORABLE ELIZABETH D. LAPORTE
UNITED STATES MAGISTRATE JUDGE                    *[signature]*

Name & Title of Judicial Officer                              Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

1  NORTHERN DISTRICT OF CALIFORNIA )
                                   ) ss:
2  COUNTY OF SAN FRANCISCO        )

3

4  **A F F I D A V I T**

5      I, Doug Hunt, Special Agent of the Federal Bureau of Investigation, being duly sworn,

6  hereby declare as follows:

7  **I.    INTRODUCTION**

8      1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and

9  have been so employed since October of 1995.  I am currently assigned to the Violent Crimes

10 and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where

11 my responsibilities involve the investigation of gangs and narcotics trafficking.  During my

12 tenure in the FBI I have been involved in numerous investigations of gang-related narcotics

13 traffickers.  Several of these investigations involved North Richmond gangs and narcotics

14 traffickers.  I have participated in physical and electronic surveillance, undercover narcotics

15 transactions, executed search warrants, and reviewed recorded conversations of drug traffickers.

16 As a federal agent, I am authorized to investigate violations of laws of the United States and am a

17 law enforcement officer with authority to execute warrants issued under the authority of the

18 United States.

19 **II.    PURPOSE OF AFFIDAVIT**

20     2.    This affidavit is being submitted in support of an application for a warrant to

21 search 1645 Second Street, Richmond, California ("SUBJECT PREMISES").  The SUBJECT

22 PREMISES is a residence used by DOSIE DEE KING ("KING") to store and distribute

23 narcotics.  As explained in detail below, I believe that evidence of violations of 21 U.S.C. §§

24 841(a)(1) (possession with intent to distribute a controlled substance), 846 (conspiracy to

25 distribute controlled substances), and 843(b) (use of communication facility to facilitate drug

26 trafficking) will be found at the SUBJECT PREMISES.  This affidavit is also submitted in

27 support of a criminal complaint and arrest warrant charging KING and FRED LEON WIGGINS

28 ("WIGGINS") with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846 and

distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1).

3.     This affidavit is submitted for the limited purpose of securing the requested search warrant and therefore I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b) will be found at the search location.

4.     This affidavit is organized into the following sections, all of which are intended to establish probable cause to search the requested location for the items to be seized: (1) Introduction; (2) Purpose of Affidavit; (3) Probable Cause; (4) Premises to be Searched; (5) The North Richmond Gang and Narcotics Trafficking; (6) Items to be Seized; and (7) Conclusion.

## III.    **PROBABLE CAUSE**

### A.    **Investigative Background**

5.     The investigation that is the subject of this affidavit has focused on narcotics trafficking and violence perpetrated by members and associates of a criminal street gang that claims North Richmond, California, as its territory and which is responsible for much of the crime that occurs in that area. This North Richmond gang is described in greater detail in section V., below.

6.     This investigation is being conducted jointly by different law enforcement agencies including the FBI, the Contra Costa County Sheriff's Office ("CCCSO"), and the Richmond Police Department ("RPD"). The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, information from cooperating witnesses, reports made to me by other law enforcement agents, physical surveillance observations, review of relevant business and public records and from individuals in this investigation and their co-conspirators. I have consulted with CCCSO Detective Lance Santiago regarding this affidavit. Detective Santiago has been working in the North Richmond area of Contra Costa County for the last seven years. For the last two years he has worked almost exclusively on gang activity in

2

North Richmond.  Detective Santiago has testified as an expert in California state court regarding gang activity in North Richmond and has qualified as an expert in California state court regarding narcotics trafficking.

7.     As described in detail below, probable cause to search the SUBJECT PREMISES is based in large part on a recorded purchase of cocaine base that occurred outside the SUBJECT PREMISES.

**B.     Criminal History of DOSIE KING**

8.     On October 16, 2006, I reviewed the criminal history of DOSIE DEE KING, aka "XL." KING has one conviction for violating three counts of California Health & Safety Code Section 11352(A), sale of narcotics, in 2002.

**C.     State Search Warrant executed on May 12, 2006, in Vallejo, California**

9.     On October 17, 2006, I spoke with Sergeant Kevin Bartlett of the Vallejo Police Department and reviewed a report regarding a search warrant executed on May 12, 2006, at approximately 10:30 p.m. at 141 Olympic Drive, Vallejo, California.  At the time of the execution of the search warrant, KING was inside the search location along with Fred Wiggins and three other adults.  Items seized in the search warrant included approximately 6.5 grams of cocaine base, two digital scales, one that appeared to have cocaine residue on it, and packaging material consistent with the distribution of narcotics.  During the execution of the warrant a detective was able to answer a telephone call into the residence from a male subject who request that a resident of the house meet him to sell $50 worth of cocaine base.  Items recovered pursuant to the search warrant included indicia that KING had been living at the residence.

**D.     Cooperating Witness Two**

10.     On October 16, 2006, Detective Santiago told me that, within the last three months, he has received information from a cooperating witness (hereafter referred to as "CW-2") concerning KING.  Detective Santiago has utilized CW-2 for four years.  Detective Santiago is not aware of any instances during that time in which CW-2 has provided false information.  Detective Santiago has previously used CW-2 in several different investigations including a federal investigation involving narcotics trafficking in Richmond, California, and was able to

corroborate information provided by CW-2. CW-2 has made controlled purchases of cocaine base and methamphetamine at the direction and under the supervision of Detective Santiago. Information provided by CW-2 has led to the conviction of two individuals for possession of methamphetamine and the seizure of a large quantity of methamphetamine. CW-2 also provided information that led to the arrest of an individual whose parole was violated based on his possession of a firearm. Detective Santiago considers the information provided by this CW-2 to be reliable. Additionally, I have met with CW-2 on approximately dozens of occasions and have had an opportunity to confirm the information CW-2 has given me on those occasions. I have reviewed CW-2's criminal history. CW-2 has previously been arrested for petty theft, possession of a controlled substance, possession of hypodermic needles, possession of marijuana for sale, receiving stolen property, writing checks with insufficient funds, vehicle theft, resisting arrest, and driving on a suspended license. CW-2 has previously been convicted of misdemeanor possession of a controlled substance, felony accessory, misdemeanor conviction insufficient funds, felony possession of a controlled substance. CW-2 has admitted using illegal narcotics. CW-2 is providing assistance on this and other related federal matters in exchange for financial compensation and future relocation and related expenses and has received financial compensation for services rendered from the FBI. Specifically, CW-2 has been paid approximately $9,000, roughly half of which paid for lodging, in the course of this investigation. CW-2 will also be paid additional funds to cover relocation expenses and for services rendered.

**E.** **Controlled Purchase of Cocaine Base By CW-2 From KING on August 16, 2006**

10.    On August 16, 2006, CW-2 conducted a controlled purchase of cocaine base from KING. I have reviewed the reports regarding this controlled purchase, spoke with CW-2 regarding this controlled purchase of narcotics, participated in surveillance during the operation, and have reviewed the covert audio and video recording of this controlled purchase.

11.    The purpose of the operation was to use CW-2 to purchase methamphetamine from a person known to CW-1 as "DOSIE." or "XL." CW-2 had previously identified a picture of KING as the individual known to CW-2 as DOSIE. CW-2 indicated that the CW-2 had

4

1   known KING for several years. CW-2 told me that CW-2 had purchased cocaine base from
2   KING "for years."
3       12.    On August 16, 2006, SA Doss met CW-2 at a predetermined staging area and
4   searched CW-2 for the presence of narcotics and money with negative results. SA Doss also
5   outfitted CW-2 with covert audio and video recording equipment. SA Doss provided CW-2 with
6   $260 to purchase cocaine base. CW-2 was provided with a vehicle to drive from the staging area
7   to Richmond. The vehicle was fitted with covert audio and video recording equipment.
8       13.    On August 16, 2006, at approximately 1:10 pm, was followed from the staging
9   area by surveillance team members that included CCCSO deputies, an RPD officer, as well as
10  myself and other FBI agents. CW-2 was followed as CW-2 drove to Second Street in Richmond,
11  California. CW-2 was observed by surveillance agents exiting CW-2's vehicle speaking briefly
12  with a black male and then approaching a large black male. The large black male was observed
13  directly in front of 1645 Second Street, the SUBJECT PREMISES. After CW-2 made contact
14  with the large black male, another black male in a T-shirt with no sleeves, was observed by
15  surveillance team members crossing the street and walking in the direction of the large black
16  male and CW-2 while still standing in front of the SUBJECT PREMISES . Thereafter, CW-2
17  was observed returning to CW-2's vehicle. CW-2 was then followed to the meeting point.
18  There, at approximately 1:30 p.m, SA Doss searched CW-2 and recovered the covert video
19  recording device from the person of CW-2. SA Michael Day searched the vehicle provided to
20  CW-2 vehicle with negative results. SA Day also recovered the recording device inside of the
21  vehicle CW-2 was using.
22      14.    At approximately 1:30 p.m., CW-2 provided me and other agents with two small
23  plastic baggies containing suspected cocaine base and ten dollars. I asked CW-2 to tell me what
24  had occurred and CW-2 told me the following. CW-2 left the staging area and traveled directly
25  to the area of Second Street in Richmond, California. Upon arriving at the location, CW-2 exited
26  the vehicle and began walking toward KING. CW-2 approached a black male known to CW-2 as
27  "Fred." Fred was subsequently identified as FRED LEON WIGGINS. CW-2 told me that
28  WIGGINS told CW-2 that DOSIE KING had cocaine base for sale. CW-2 then approached

5

1    KING and asked for "a half" (meaning a half ounce of cocaine base).  CW-2 then gave KING

2    $260.  CW-2 then said that KING directed WIGGINS to get the cocaine base.  KING then gave

3    CW-2 $10.00 in change.  WIGGINS walked across the street and then returned with two bags of

4    what appeared to be cocaine base.  When WIGGINS made a motion like he was only going to

5    give only one of the bags of cocaine base to CW-2,  KING directed WIGGINS to give both of the

6    bags of suspected cocaine base to CW-2.  WIGGINS said he was just kidding and then gave CW-

7    2 the second bag of suspected cocaine base.  CW-2 then told me CW-2 returned to the vehicle

8    and drove to the staging area.

9          15.    I have reviewed the covert video and audio recording of the controlled purchase of

10   narcotics on August 16, 2006.  This recording shows CW-2 driving from the staging area through

11   North Richmond.  The recording shows CW-2 parking and then exiting CW-2's vehicle.

12   Thereafter, the recording shows CW-2 walking on a street in a residential neighborhood.

13   Several individuals can be seen on the street.  The video then shows CW-2 being approached by

14   a black male with no sleeves on his T-shirt.  From the audio portion CW-2 can be heard

15   addressing this individual as Fred.  I believe this person is WIGGINS.  I believe this because I

16   have compared the video recording with the California DMV photograph of FRED LEON

17   WIGGINS and they are the same.  In the recording, WIGGINS tells CW-2 that "fat boy has got

18   it" and points in a direction further down the street.  The recording then shows CW-2

19   approaching a large black male leaning against a car.  I believe this black male is DOSIE KING.

20   I believe this because I have compared the California DMV photograph of DOSIE KING with

21   the black male in the video and they are the same.  CW-2 can be heard asking KING if he has a

22   half.  KING can be heard asking how much money CW-2 has.  CW-2 can be seen counting out

23   U.S. currency and giving it to KING.  The recording then shows KING giving CW-2 some U.S.

24   currency.  The video recording also shows WIGGINS approach and give a small plastic bindle to

25   CW-2.  KING then looks in the direction of WIGGINS.  WIGGINS can be heard laughing and

26   indicates that he was joking with CW-2.  The recording also shows CW-2 returning to the

27   staging area from North Richmond with no intermediate stops.

28          16.    On October 20, 2006, I reviewed a Drug Enforcement Administration report

6

regarding the analysis of the suspected cocaine base purchased from KING on August 16, 2006. According to the report, the substance was 13.6 grams of a mixture or substance containing a detectable amount of cocaine base.

**F.**    **Surveillance on September 26, 2006**

17.    On September 26, 2006, Special Agents of the FBI surveillance squad conducted a surveillance of DOSIE KING. At approximately 10:43 a.m., a black male matching the physical description of DOSIE KING, was observed exiting 141 Olympic Drive, Vallejo, California. KING and four other occupants were observed getting into a 2002 Acura. KING and the Acura were then followed to the area of Second and Silver in North Richmond. KING was then observed exiting the vehicle and walking into the front yard of the SUBJECT PREMISES. KING then disappeared from the view of the surveilling agents.

**G.**    **DMV records of DOSIE KING**

18.    On October 16, 2006, I reviewed driver's license records for DOSIE KING. These records indicates that KING lists his address as 1645 Second Street, Richmond, California, the SUBJECT PREMISES.

**IV.**    **PREMISES TO BE SEARCHED**

19.    1645 Second Street is further described as a single story, single family dwelling located on the west side of Second Street facing to the east. The structure is yellow in color with light red trim. The front yard is surrounded by a five foot cyclone fence with a "No Trespassing" sign affixed to the sliding gate. The front porch is partially enclosed with the front door facing to the north. The numbers 1645 are affixed to the red post at the entrance to the porch in gold lettering in a vertical fashion.

a.    The area to be searched includes the house described above at 1645 Second Street, including rooms, attics, basements, porches, locked containers and safes, and other parts therein, as well as the surrounding grounds and driveway, any garages, carports, storage rooms, storage lockers, trash containers, and outbuildings specifically associated with, or assigned to, 1645 Second Street and any vehicles parked on the property or in the driveway specifically associated with, or assigned to, 1645 Second Street.

V.    **THE NORTH RICHMOND GANG AND NARCOTICS TRAFFICKING**

    A.    **The North Richmond Gang and Its Subsets**

      20.    North Richmond has been plagued by gang violence and pervasive narcotics trafficking for the last twenty years. In North Richmond, sales of narcotics are made not only to residents of North Richmond, but also to residents of surrounding Bay Area communities who travel to North Richmond to buy drugs. Narcotics trafficking within North Richmond is dominated by a violent criminal street gang. This gang was first recognized by law enforcement in the mid-1980's as the Project Trojans ("PJT"). The PJT originally began in the public housing projects of North Richmond. Since that time, the gang has evolved into an overall North Richmond gang and its members use a number of terms to identify themselves as belonging to the North Richmond gang such as being from "North," "Narf," "Nolia," "Project," or "PJT." Members also identify themselves through the North Richmond gang's various subgroups or sets. Many of the gang members who previously identified themselves as "Project Trojans" are either dead or incarcerated. Regardless of the names or titles used by the North Richmond gang, its members have controlled North Richmond's highly profitable narcotics trade through violence, fear and intimidation.

      21.    I know from speaking with Detective Lance Santiago and other detectives, deputies and agents about the North Richmond gang and narcotics trafficking in North Richmond, as well as from working in the North Richmond area myself and from debriefing several cooperating witnesses that an individual is not allowed to sell narcotics in North Richmond unless they are a member or close associate of the North Richmond gang. I am aware of investigations into numerous shootings and homicides where North Richmond gang members have used firearms to protect their narcotics trafficking business. I have also reviewed reports and seen photographs seized pursuant to search warrants served by me and other law enforcement personnel in which North Richmond gang members flashing gang signs and hold firearms and narcotics.

      22.    Based on my participation in investigations into narcotics trafficking by the North Richmond gang, including discussions with numerous cooperating North Richmond gang

1    members, I have learned about the various subsets within the overall North Richmond gang.

2    These subsets are generally defined by longstanding family relationships or by the locations

3    within North Richmond where gang members sell narcotics and commit crimes of violence.

4    These sets can be loosely affiliated for the purpose of organized street level narcotics trafficking

5    in North Richmond. These subsets include groups known as "The Dog Pound," "The Yard," "3rd

6    and Silver," "The Mad Circle, " "The Gates," "The Shack," "5th," "Willard, " and "Da Hype."

7    In addition, a group of younger North Richmond gang members have sought to distinguish

8    themselves from the older more senior PJT gang members by calling themselves "Young Niggas"

9    or the "Young Nigga Nation" and are spread across several of the previously mentioned subsets.

10   The "Young Niggas" typically wear hats or jerseys bearing the New York Yankees baseball team

11   logo. These subsets generally avoid inter-gang rivalry by selling different types of narcotics in

12   their own sections of North Richmond while banding together for purposes of protection and

13   retaliation.

14       23.    The primary rivals of the North Richmond gang are individuals from Central and

15   South Richmond. North Richmond gang members will "go on missions" into those areas to

16   shoot and/or kill anyone they believe is associated with Central and South Richmond gangs.

17   North Richmond gang members are expected to shoot and/or kill members of Central and South

18   Richmond gangs that travel into North Richmond.

19   **B.    Knowledge, Training, and Experience Regarding Narcotics Trafficking In**

20   **        General and By North Richmond Gang Members in Particular**

21       24.    It is common for dealers of controlled substances to have controlled substances

22   that are packaged for sale in the place where they live or sell from, in their vehicles, or on their

23   persons. Individuals involved in illegal trafficking of controlled substances often conceal

24   evidence of their drug dealing in their residences and businesses, or the residences of friends or

25   relatives, the locations used to facilitate their narcotics trafficking, and in surrounding areas to

26   which they have ready access such as garages, car ports and outbuildings. They also conceal

27   evidence in vehicles, including vehicles outside their residences or in the vicinity of their drug

28   distribution locations, so that they have ready access to it and so that they can hide it from law

1   enforcement, including law enforcement officers executing search warrants at their residences

2   and businesses.  In addition, and in this case in particular, evidence has established that the co-

3   conspirators involved in this investigation utilize vehicles registered in other people's names.

4       25.    Evidence also may be found in other areas to which a narcotics trafficker has

5   ready access, such as rented storage areas and safety deposit boxes.  This evidence, which is

6   discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for

7   manufacturing, weighing, packaging, and distributing drugs, other contraband, records and

8   evidence of drug transactions, proceeds from sales of drugs, and assets purchased with the

9   proceeds of narcotics trafficking.

10      26.    Individuals involved in illegal trafficking of narcotics commonly use certain

11  equipment and paraphernalia to manufacture, weight, package, and prepare controlled substances

12  for distribution.  The paraphernalia includes packing materials (such as plastic baggies, balloons,

13  wrapping paper, cellophane, condoms, and film canisters), scales to weigh controlled substances,

14  and cutting agents and dilutants to stretch the quantity of the controlled substance so they can

15  increase their product amount and increase sales.  In processing cocaine base and

16  methamphetamine, these individuals often use equipment, including grinding equipment such as

17  a coffee grinders and or containers to cook or transform cocaine into cocaine base.  Narcotics

18  traffickers commonly store these items on their person, in their residences, garages, outbuildings,

19  storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in

20  abandoned residences near their drug distribution locations, in their vehicles, and in other areas

21  to which they have ready access.

22      27.    Narcotics traffickers often maintain records of their transactions in a manner

23  similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold,

24  documentary records often remain for long periods of time, sometimes years, to memorialize and

25  record past transactions, the status of monies owed and received, and the names and telephone

26  numbers of suppliers, customers, and co-conspirators.  These records can be maintained on

27  paper, in the form of business and personal ledgers and diaries, calenders, memoranda, pay-owe

28  sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.

28.    These records described above often reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers.  Records often indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker, and by co-conspirators in the distribution of controlled substances.  Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances.  These records include property rental and ownership records such as deeds of trusts and lease and purchase agreements, and vehicle registration, rental, and ownership information.  These records are stored by narcotics traffickers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

29.    The records described above also can exist in electronic form on computers and in computer software and computer disks stored outside the computer.  Further, data that is processed by a computer may be written to the computer hard drive or other storage medium even if the user does not intentionally save the information.  For example, a computer operating system may take random data out of working memory and use it to "pad" files on a computer hard drive during the storage process.   Electronic information can remain on computer storage media, such as hard drives, for an indefinite period of time.  Even when a computer user attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques.

30.    Narcotics traffickers often travel to facilitate their trafficking.  Evidence of travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts related to travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and visas and their contents.  These items are stored by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

31.     Narcotics traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money, and other valuables. Narcotics traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money, and other valuables in areas such as storage. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles. Narcotics traffickers also often conceal evidence of drug dealing in vehicles outside their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents) evidence tending to show the distribution of narcotics (such as IOU's, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address books, et cetera), digital pagers (and their contents), cellular/mobile telephones (and their contents), and counter-surveillance devices.

32.     Other evidence of transportation, ordering, possession, and sale of drugs can include the following: telephone bills to show the numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposits and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by narcotics traffickers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

33.     Narcotics traffickers usually sell their products for cash. Because kilogram quantities of cocaine and pound quantities of methamphetamine can sell for thousands of dollars even at the wholesale level, dealers typically have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other

1    assets generated by their drug business, or purchased with cash earned, such as precious metals
2    and stones, jewelry, real estate, vehicles, electronic equipment, computers, and other valuables.
3        34.    Evidence of significant, unexplained income of narcotics traffickers, or of the
4    acquisition and concealment of money and assets from drug sales, can be found on banking and
5    investment account statements, credit card account statements, canceled checks, money orders,
6    deposit slips, check and savings books, business and personal ledgers, accounting records, safe
7    deposit box records and keys, federal and state tax records, rental receipts, rental agreements,
8    utility bills, overnight mail receipts, telephone bills, loan statements, records reflecting ownership
9    of real or personal property (such as deeds of trust or vehicle registration, insurance, and
10   ownership information), agreements, and canceled mail. These records can be maintained on
11   paper, but also can be maintained as computer data on computers and in computer software and
12   computer disks. Also, records can be maintained in electronic organizers. The above items are
13   typically kept by drug dealers on their person or in their businesses, residences and surrounding
14   garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.
15       35.    Narcotics traffickers typically use telephones, pagers, two-way radio systems, fax
16   machines, other communication systems, counter surveillance devices, and related devices in
17   their drug trafficking activities. These items are stored by drug dealers on their person or in their
18   businesses, residences or cars, or the residences of friends or relatives. These items are typically
19   equipped with data storage capability and contain phone numbers and/or electronic messages
20   relating to drug trafficking activity. Information stored in electronic form on all of the above
21   devices can provide evidence of drug trafficking and the identity of associates. For example,
22   numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed
23   dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can
24   provide evidence of who the narcotics trafficker is calling, and thus the identity of potential
25   customers and suppliers. Pagers, cellular telephones, and other communication devices can
26   contain similar information. Also, logs from fax machines can be evidence of messages sent and
27   received, and the corresponding telephone numbers of possible associates and co-conspirators.
28   Often, telephone answering machines retain recorded messages. The incoming messages can

1    provide evidence of drug trafficking and the identity of associates while the outgoing message

2    can provide evidence of who controls the telephone line.

3    36.    Documents showing who owns, occupies, or controls the location being searched

4    also show who is responsible for the items found on the premises, including contraband and other

5    evidence seized.  Documents and items showing the identity of the persons owning, residing in,

6    or controlling the area being searched include, but are not limited to, utility and telephone bills,

7    canceled envelopes and correspondence, outgoing answering machine messages, tax returns,

8    keys, deeds, and mortgage receipts.

9    37.    North Richmond gang members often memorialize their gang association and

10   narcotics trafficking by taking, or posing for, photographs and/or videos of themselves, their

11   associates, their property, assets, firearms, and tattoos.  For example, North Richmond gang

12   members often take photographs of themselves and their associates while in the process of

13   narcotics sales and in the areas where they traffic narcotics.  They also photograph or videotape

14   themselves while displaying hand signs that indicated their affiliation with the street gang and

15   thus showing evidence of their involvement with a gang-based narcotics trafficking conspiracy.

16   They usually maintain these photographs and/or videos on their person or in their computers,

17   businesses, residences or cars, or the residences of friends or relatives.  In addition, North

18   Richmond gang members often create CDs, DVDs, or tapes of themselves singing or rapping

19   about narcotics trafficking and other gang-related criminal activities.

20   38.    Narcotics traffickers, including participants in the North Richmond gang-based

21   narcotics trafficking conspiracy, often maintain firearms and ammunition on their person or in

22   their homes, businesses, cars or residences, businesses or cars of associates or family members to

23   protect themselves and their narcotics and assets purchased with narcotics trafficking proceeds.

24   They also may maintain indicia of firearms and ammunition possession such as receipts for

25   firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other

26   documentation for firearms and ammunition.

27   39.    As discussed above, narcotics traffickers often conceal evidence of drug dealing in

28   vehicles outside their residences for ready access and to prevent detection and seizure by officers

14

executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents) evidence tending to show the distribution of narcotics (such as IOU's, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address books, et cetera), digital pagers (and their contents), cellular/mobile telephones (and their contents), and counter-surveillance devices

## VI.    ITEMS TO BE SEIZED

40.    Based on my training, experience, and knowledge of this investigation as set forth above, I seek authorization to seize the following items from the SUBJECT PREMISES:

(1)    Controlled substances, including substances containing a detectable amount of cocaine, including cocaine powder, cocaine base, and cocaine salts (regardless of form, i.e., whether wholly or partially pure, diluted in preparation for distribution, or in any preparatory form); any substance containing a detectable amount of methamphetamine (regardless of form, i.e., whether wholly or partially pure, diluted in preparation for distribution, or in any preparatory form); and any other controlled substances found on the premises (regardless of form).

(2)    Equipment and paraphernalia used in the manufacture, sale, distribution, preparation for sale or distribution (e.g. dilution or cutting) or use of cocaine and methamphetamine, including scales, measuring devices, balloons, plastic baggies, plastic wrap, plastic envelopes, film canisters, and cutting and adulteration agents.

(3)    Paper writings and records evidencing the manufacture, sale, distribution, or possession of controlled substances, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, evidence of off-site storage (such as storage locker receipts and safety deposit box rental records and keys), documents reflecting domestic and international travel (such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts).

15

1    (4)    United States or foreign currency derived from the sale of controlled

2 substances in violation of 21 U.S.C. §§ 841 and 846, and money wrappers, rubber bands, money

3 containers, and money counting machines.

4    (5)    Financial instruments purchased with large amounts of currency derived

5 from the sale of controlled substances, including travelers checks, bonds, stock certificates,

6 cashiers checks, certificates of deposit, and money orders.

7    (6)    Records, documents and deeds reflecting the purchase or lease of real

8 estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of

9 controlled substances.

10    (7)    Any boxes, bags, briefcases, suitcases or containers used to carry

11 controlled substances.

12    (8)    All firearms, ammunition, and other items relating to the possession,

13 maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests,

14 spare firearms parts, holsters, cleaning kits, and all other documentation which relates to the

15 possession, sale or transfer of firearms, including but not limited to photographs, receipts for the

16 purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes.

17    (9)    Documents, items, and indicia tending to establish the identity of persons

18 in control of the premises and/or things described in this warrant, including utility bills, rent

19 receipts, canceled checks, bank and other financial statements and records, deposit receipts,

20 passports, driver's licenses, social security cards, mail, and other identification documents, land

21 and lease titles, escrow papers, photographs, video and audio records, and keys.

22    (10)    Documents, photographs, video recordings, audio recordings, items and

23 other indicia evidencing membership, affiliation, association or interaction with the North

24 Richmond gang and its subsets, including notes, letters, mailings, correspondence, pictures, and

25 audio or video recordings (even lyrics and performances) referring to narcotics trafficking and/or

26 "North Richmond," "Narf," "North," "Nolia," "Project," "PJT," "The Dog Pound," "The Yard,"

27 "3rd and Silver," "The Mad Circle, " "The Gates," "The Shack," "5th," "Willard," "Da Hype,"

28 "Young Niggas," or "Young Nigga Nation."

16

(11)    Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, personal digital assistants ("PDA's"); mobile telephones, pagers, and answering machines (collectively, "Electronic Devices") that could contain evidence of the manufacture or distribution of controlled substances or participation in a conspiracy to manufacture, distribute, and/or possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1), or use of such devices in violation of 21 U.S.C. § 843(b).  In addition, some of these devices may be a forfeitable instrumentality of the crimes, or fruit of the crimes prohibited by 21 U.S.C. §§ 841(a)(1), 846, and 843(b).

41.    Specifically, I seek authorization to search any seized Electronic Devices for the following evidence:

(a)    Names and contact information of individuals who may be engaged in narcotics trafficking contained in any Electronic Device;

(b)    Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from an Electronic Device;

(c)    Text messages both sent to and received from an Electronic Device relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking;

(d)    Incoming and outgoing voice mail messages both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking; and

(e)    Browser messages and/or internet communications (e.g., e-mail; text messages) both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking; and

(f)    Documents in electronic format, including Microsoft Word or Adobe PDF files, relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking

42.    This evidence will be seized following the approved procedures described below.

A.    **Seizure and Search of Electronic Devices**

17

43.   <u>Computer Hardware</u>:  Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

44.   <u>Computer Software</u>:  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

45.   <u>Computer-Related Documentation</u>:  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

46.   <u>Computer Passwords and Other Data Security Devices</u>:  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

47.   Based on my knowledge, training, and experience, and consultations with FBI agents who are experienced with computers and specially-trained in computer search and seizure, I have learned that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items

18

themselves may be  instrumentalities, fruits, and/or evidence of crime; and/or (2) the items may

have been used to collect and store information about crimes (in the form of electronic data).

Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and

seize computer hardware, software, documentation, passwords, and data security devices which

are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for

information about crimes.  In addition, I have learned and know that searching and seizing

information from computers often requires agents to seize most or all electronic storage devices

(along with related peripherals) to be searched later by a qualified computer expert in a

laboratory or other controlled environment.  This is true because of the following:

(a)    Volume of Evidence:  Computer storage devices can store the equivalent

of thousands of pages of information.  Additionally, a suspect may try to conceal criminal

evidence; he or she might store it in random order with deceptive file names.  This may require

searching authorities to examine all the stored data to determine which particular files are

evidence or instrumentalities of crime.  This sorting process can take weeks or months,

depending on the volume of data stored, and often it would be impractical to attempt this kind of

data search on site.

(b)    Attempted Deletion of Electronic Records and Information:  Electronic

records and information can remain on computer storage media, such as computer hard drives,

for an indefinite period of time.  Even when a computer user attempts to delete records and

information from a computer storage medium, the records and information may still exist and can

be recovered through computer forensic techniques.  These computer forensic techniques can be

time-consuming, and often it would be impractical to do them on site.

(c)    Technical Requirements:  Searching computer systems for criminal

evidence is a highly technical process requiring expert skill and a properly controlled

environment.  For example, on site and laboratory analysis by a qualified computer specialist is

often required in order to properly retrieve and analyze electronically stored (computer) data,

document and authenticate the data, and prevent the loss of the data either from accidental or

deliberate programmed destruction.  In many cases, the evidentiary data can be backed up to

government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

48. <u>Analysis of Electronic Data</u>: The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberates hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to narcotics trafficking.

**B.    Search Procedure**

49. In executing this warrant, the government must begin by ascertaining whether all

1   or part of a search of an Electronic Device that is authorized by this warrant reasonably can be

2   completed at the site within a reasonable time.  If the search reasonably can be completed on site,

3   the government will remove the device from the site only if authorized by law because removal is

4   (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality

5   of the crime, or fruit of the crime.

6         50.     If the government determines that a reasonable search as authorized in this

7   warrant cannot be completed at the site within a reasonable period, the government must

8   determine whether all or part of the authorized search can be completed by making a mirror

9   image of, or in some other manner duplicating, the contents of the device and then completing

10   the search of the mirror image off-site (e.g., at a computer crime laboratory).

11         51.     The government may remove from the search location a device only if the device

12   cannot be searched reasonably on-site, or by mirror-imaging or otherwise duplicating its contents

13   for off-site examination – unless authorized by law to remove the device because (1) removing

14   the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable

15   instrumentality of the crime, or fruit of the crime.  The government may also remove from the

16   site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or

17   software manuals) that reasonably appear to be necessary to conduct an off-site search of a

18   device in which data is stored electronically.

19         52.     If the government removes a device or related equipment or documents from the

20   place they were found in order to complete the search off-site, within ten (10) calendar days of

21   the removal the government must file a return with a magistrate judge that identifies with

22   particularity the removed device or related equipment or documents.

23         53.     The government must complete the off-site search of a device that agents removed

24   in order to search for evidence of a crime as promptly as practicable and no later than thirty (30)

25   calendar days after the initial execution of the warrant.  Within thirty (30) calendar days after

26   completing an off-site search of a device pursuant to this warrant, the government must return

27   any device, as well as any related equipment or document that was removed from the site in order

28   to complete the search, unless under the law, the government may retain the device, equipment,

1    or document (1) to preserve evidence, or (2) because the device, equipment, or document is

2    contraband, a forfeitable instrumentality of the crime, or fruit of the crime.  Within a reasonable

3    period, not to exceed sixty (60) calendar days after completing the authorized search of a device,

4    the government also must use reasonable efforts to destroy – and to delete from any devices or

5    storage media or copies that it has retained or made – copies of any data that are outside the

6    scope of the warrant but that were copied or accessed during the search process, unless, under the

7    law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are

8    contraband, a forfeitable instrumentality of the crime, or fruit of the crime.  The deadlines set

9    forth in this paragraph may be extended by court order for good cause shown.

10           54.    In conducting the search authorized by this warrant, whether on-site or off-site,

11   the government must make all reasonable efforts to use methods and procedures that will locate

12   and expose only those categories of files, documents, or other electronically stored information

13   that are identified with particularity in the warrant while, to the extent reasonably practicable,

14   minimizing exposure or examination of irrelevant, privileged, or confidential files.

15           55.    The terms of this warrant do not limit or displace any person's right to file a

16   motion for return of property under F.R.Cr.P. 41(g).  Nor does the issuance of this warrant

17   preclude any person with any interest in any seized item from asking the government to return the

18   item or a copy of it.

19           56.    The government must promptly notify the judge who authorized issuance of the

20   search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arixses

21   about rights or interests in any seized or searched item – or any data contained in any searched or

22   seized item – and that dispute cannot be resolved informally.  The government must deliver a

23   copy of this written notification to any person known to assert any such right or interest.

24   **VI.    CONCLUSION**

25           57.    For the reasons stated above, I believe that probable cause exists to search 1645

26   Second Street, Richmond, California, for evidence of violations of 21 U.S.C. § 846 (conspiracy

27   to manufacture, distribute, and possess with intent to distribute narcotics); 21 U.S.C. § 841(a)(1)

28   (manufacture, distribution, and possession with intent to distribute narcotics); and 21

U.S.C. § 843(b) (use of communication facility to facilitate drug trafficking).  I also believe there is probable cause to believe that DOSIE DEE KING and FRED LEON WIGGINS conspired to distribute and distributed cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1).  I respectfully request that the Court issue the requested search and arrest warrants and criminal complaint.


_____
DOUG HUNT
Special Agent, Federal Bureau of Investigation


Sworn to before me this
24 day of Oct -


_____
HON. ELIZABETH D. LAPORTE
UNITED STATES MAGISTRATE JUDGE